| | |
|---|---|
| DISTRICT COURT, COUNTY OF ARAPAHOE, STATE OF COLORADO<br>7325 S. Potomac Street<br>Centennial, Colorado 80112 | |
| Plaintiff: PATRICK ADAMS, individually and as personal representative of the Estate of Andree C. Adams and CHRISTELLE BECK<br><br>and<br><br>Defendant: SUNRISE SENIOR LIVING, LLC a Virginia limited liability corporation; SZR ORCHARD AL, LLC doing business as Sunrise at Orchard, a Colorado limited liability corporation; DOES 1-5 | ▲COURT USE ONLY▲ |
| Attorney for Plaintiffs:<br>Leslie A. Frost, #40386<br>FROST & BECK, PC<br>6898 South University Boulevard, Suite 110<br>Centennial, Colorado 80122<br>Telephone: (303) 433-0707<br>Facsimile: (303) 648-5874<br>E-mail: leslie@frostbecklaw.com | **Case No.**<br><br>Div/Ctrm: |
| COMPLAINT AND JURY DEMAND | |

COME NOW the Plaintiffs herein, by and through their attorney, Leslie A Frost, of the law offices of FROST & BECK, PC and for their Complaint against Defendants Sunrise Senior Living, LLC, (hereinafter "Sunrise Senior Living") and SZR Orchard AL, LLC (hereinafter "Sunrise at Orchard") and Does 1-5 (collectively referred to as Defendants), state and allege as follows:

## I.    STATEMENT OF PARTIES AND JURISDICTION

1.    Plaintiff, Patrick Adams, is the son of Andree Adams (hereinafter "Mrs. Adams") and resides in the County of Arapahoe, State of Colorado.

2.    Plaintiff, Christelle Beck, is the daughter of Mrs. Adams and resides in the County of Arapahoe, State of Colorado.

3.    Mrs. Adams died on June 20, 2019 from complications due to a fall while a resident of one of Defendants' facilities.

4.    Patrick Adams was appointed as the Personal Representative of the Estate of Mrs. Adams on September 24, 2019 by the Arapahoe District Court in case number 19PR30846.

5.    Patrick Adams and Christelle Beck are the only surviving children of Mrs. Adams.

6.    Patrick Adams, Christelle Beck, Erick Adams and Kayla Adams are the heirs to the estate of Mrs. Adams.

7.    Upon information and belief, and at all times relevant hereto, Defendant Sunrise Senior Living was a Virginia limited liability corporation, was the parent company to Defendant SZR Orchard AL, LLC and was authorized to transact business in the State of Colorado.

8.    Upon information and belief, at all times relevant hereto, Defendant SZR Orchard AL, LLC was a Colorado limited liability corporation using the trade name "Sunrise at Orchard" that operated the assisted living facility located at 5975 S Holly St., Littleton, CO 80121 and was authorized to transact business in the State of Colorado.

9.    Upon information and belief, Sunrise at Orchard is managed by Sunrise Senior Living Management Inc.

10.    Upon information and belief, Defendants either individually and/or jointly owned, operated, managed and/or controlled Sunrise at Orchard.

11.    Upon information and belief, and at all times relevant hereto, Defendant Sunrise Senior Living began in 1981 and has more than 325 Sunrise Senior Living communities throughout the U.S., in Canada and the United Kingdom.

12.    Mrs. Adams was a resident of Sunrise at Orchard in reminiscent care from May 28, 2019 until June 12, 2019 and in the care of Defendants; a period of 2 weeks.

13.    While Mrs. Adams was a resident of Sunrise at Orchard, she sustained injuries at Sunrise at Orchard, which caused her death on June 20, 2019.

14.    Venue is proper in the Arapahoe County District Court because the acts and omissions complained of herein occurred within Arapahoe County.

2

## II.     FACTUAL BACKGROUND

15.     Plaintiffs hereby incorporate paragraphs 1-14 as though fully set forth herein.

16.     Upon information and belief, Sunrise at Orchard opened for business and began accepting residents in September 2015.

17.     In April 2019, Christelle Beck and Mrs. Adams' daughter-in-law, Sharon Adams, individually toured Sunrise at Orchard reminiscent care area.

18.     During the tour, Sharon Adams spoke to management and explained that Mrs. Adams suffered from dementia, was wheelchair bound, was a two-person assist, and needed to be hand fed.

19.     Christelle Beck spoke to a salesperson at Sunrise at Orchard and explained that Mrs. Adams suffered from dementia, was wheelchair bound, was a two-person assist, and needed to be hand fed.

20.     Mrs. Adams lived in a condominium in La Jolla, California with caregivers, but Plaintiffs wanted her closer to them in Denver; thus, the reason why the family contacted Sunrise at Orchard.

21.     The management at Sunrise at Orchard assured the family that their reminiscent care facility was well managed by fully trained caregivers and that Mrs. Adams would get wonderful care.

22.     On May 2, 2019, as a part of the intake, Sunrise at Orchard had a nurse from Sunrise in La Jolla assess Mrs. Adams in her home to see if the Sunrise Senior Living system would be appropriate for her.

23.     Sunrise in La Jolla reported that Mrs. Adams would fit well with the Sunrise Senior Living assisted living reminiscence care program.

24.     On May 10, 2019, Sharon Adams flew from Denver to La Jolla and took videos of Mrs. Adams being hand fed and of her lack of mobility.

25.     Sharon Adams returned to Denver and met with the head nurse of Sunrise at Orchard, Marilyn Hoffman ("Nurse Hoffman") and a sales representative, and showed them the videos of Mrs. Adams.

26. The family wanted to make certain that Mrs. Adams would be a good fit for Sunrise at Orchard as her welfare was of the upmost importance to them.

27. Sunrise at Orchard assured the family that they had carefully trained staff who could care for someone of Mrs. Adams' level of dementia and in her physical condition.

28. Sharon Adams flew back to La Jolla on May 22, 2019 and took Mrs. Adams to her primary care medical provider to be assured that Mrs. Adams would be able to fly to Denver without incident.

29. On May 28, 2019, Sharon Adams flew to Denver with Mrs. Adams and her primary caregiver, Maria Hernandez Lopez ("Maria Lopez"), who had been caring for Mrs. Adams since 2006.

30. The family decided that Maria Lopez should help transition Mrs. Adams to life at Sunrise at Orchard so that she would not have any fears of a new place and new providers.

31. Nurse Hoffman examined and assessed Mrs. Adams, including performing a skin test, when Mrs. Adams checked into Sunrise at Orchard on May 28, 2019 and found that Mrs. Adams was fine other than a wound on her lower left leg where she had an injury from her wheelchair.

32. Mrs. Adams did not speak but understood what she was being told and responded to questions with a nod or shake of the head or babbling to her family.

33. Mrs. Adams could no longer use her torso muscles to move around and her leg muscles were too weak to stand making her especially vulnerable to falls or being unable to adjust her position when lying down or sitting.

34. Maria Lopez stayed with Mrs. Adams on the first night to make certain that Mrs. Adams was comfortable.

35. On May 30, Nicole Russell ("Mrs. Russell"), the Reminiscence Coordinator, told Sharon Adams that she did not have enough staff to do the daily items required for Mrs. Adams on a regular basis and that she was hiring another person.

36. Mrs. Russell assured the family that they could still care for Mrs. Adams while waiting for a new person to be hired.

37. June 2, 2019 was Mrs. Adams's birthday and because the family planned to take her to lunch, they requested that she be dressed nicely and ready to go at noon.

4

38. When the family arrived, Mrs. Adams was slumped in a chair with a dirty tee-shirt showing under her dirty dress and her dress was up to her hips exposing her adult diapers.

39. Maria Lopez laid Mrs. Adams on the bed to change her into something nice and clean.

40. When Maria Lopez took off Mrs. Adams's clothing, she saw a large bruise on Mrs. Adams's breast approximately 6 inches by 6 inches and what looked like three fingerprints on her abdomen.

41. Sunrise at Orchard had not informed the family of this shocking injury.

42. When questioned, Ms. Russell made excuses as to why the family had not been informed and why there was no investigation or write-up on the incident.

43. At some point, Ms. Oehrlein, the director of Sunrise at Orchard, allegedly filed an incident report with the State of Colorado but the family was never informed of how Mrs. Adams was injured; on what type of investigation was performed; was never given a copy of a police report if one was issued; and was never given a copy of the report filed with the State of Colorado.

44. The family requested a copy of Mrs. Adams's file from Sunrise at Orchard and there is no report to the State of Colorado in the file.

45. On June 2, 2019, one of the residents was permitted to enter into Mrs. Adams's room and used the toilet to defecate, dirtying the bathroom floor and toilet.

46. This breach of security was reported to Sunrise at Orchard and they promised the family that they would keep Mrs. Adams's door locked going forward.

47. Despite Sunrise at Orchard's assurances, few days later Sharon Adams found a resident in Mrs. Adams's room wearing no clothing trying on Mrs. Adams's clothes hanging in her closet, while Mrs. Adams was still in bed unable to speak or yell out for help.

48. Sharon Adams saw defecation on the bathroom floor and saw that the resident had mixed her soiled clothing with Mrs. Adams's clothing.

49. On June 2, 2019, after the birthday lunch, Robyn King, NP ("Nurse King") of Bloom Health Care came to see Mrs. Adams.

50. Nurse King stated in multiple areas of her notes to Sunrise at Orchard that Mrs. Adams needed the assistance of "two or more helpers."

5

51. On June 3, 2019, Pat Adams, Christelle Beck and Sharon Adams met with Ms. Oehrlein as they were concerned that Sunrise at Orchard was not capable of adequately providing the care and protection that Mrs. Adams required and wanted to discuss removing her from Sunrise at Orchard.

52. Some of the family's concerns were the large bruise on Mrs. Adams breast and the finger prints on her abdomen; the fact that Mrs. Adams had to sit and wait staring at her food for a long period of time before being fed; that no one person was assigned to feed Mrs. Adams; that she did not seem to be getting enough liquids to drink; that some of the caregivers did not pay attention to Mrs. Adams while feeding her; that she was often slumped over during the meals; that there were not enough caregivers to take care of the reminiscent care residents; and that the door to her room was not locked, among other things.

53. Ms. Oehrlein assured them that Sunrise at Orchard could and would meet Mrs. Adams's needs; that the staff at Sunrise at Orchard were trained to work with residents such as Mrs. Adams; and that she would make any necessary changes required including having the same caregiver feed Mrs. Adams for her meals.

54. Ms. Oehrlein assured the family that Sunrise at Orchard was a suitable place for Mrs. Adams and that she would be safe.

55. Ms. Oehrlein explained that she had been on a vacation and Ms. Russell had to manage the Reminiscence care portion of Sunrise at Orchard without her oversight while she was gone and assured them a report about Mrs. Adams injuries observed on June 2, 2019 would be filed with the State of Colorado, that this would never happen again and a full investigation would take place.

56. In reliance on Ms. Oehrlein's assurances, the family decided to keep Mrs. Adams at Sunrise at Orchard.

57. The family never saw the alleged report to the State of Colorado and were only told that no one knew how the bruising injury occurred.

58. At the request of the family, Cynthia Taylor ("Ms. Taylor") from Bayada Home Health Care, Inc. ("Bayada") came on June 7, 2019 to observe how Mrs. Adams was being fed by the caregivers during lunch and assess her ability to swallow certain foods.

59. Christelle Beck had noticed that there were not enough staff to feed the residents and that some of the residents were feeding each other and that Mrs. Adams was being neglected in her feedings.

60. Ms. Taylor observed that Mrs. Adams was not being fed correctly by the caregiver assigned to her that day and that the other residents were not being fed correctly.

61. Ms. Taylor sat at Mrs. Adams table and observed that the caregiver was shoving food into Mrs. Adams's mouth while looking around the room causing Mrs. Adams to aspirate the food without the knowledge of the caregiver.

62. Additionally, Ms. Taylor observed the caregiver switching back and forth from textured to liquid foods.

63. Ms. Taylor had to stop the feeding and instructed the caregiver on how to feed Mrs. Adams.

64. Ms. Taylor made arrangements with Ms. Russell to come back and train the entire staff on correct methods of feeding for all of the residents.

65. Ms. Taylor made the following recommendations to Sunrise at Orchard because Mrs. Adams was "at high aspiration risk:"

    a. Puree diet, nectar thick liquids;
    b. Maintain consistent caregivers for all feedings;
    c. Provide same texture consistency vs. alternating solid and liquid;
    d. Liquids by cup only – no spoon;
    e. Tell client what you are feeding/providing;
    f. If cough occurs, allow time to cough/clear before giving more food/liquid;
    g. Present an empty spoon to elicit a swallow if she's holding food in her mouth;
    h. Ensure head position is upright, not leaning backward or to the side.

66. Ms. Taylor's recommendations to Sunrise at Orchard were never followed.

67. Mrs. Adams was never given the same caregiver to feed her; Sharon Adams had to stop a staff member from giving her solid food; liquids were given to Mrs. Adams by spoon over the family's objections; the family had to correct the caregivers from feeding Mrs. Adams with her head back and/or with her head slumped over; Mrs. Adams was constantly choking on food; the staff continued alternating solid with liquid; and Mrs. Adams had the beginnings of pneumonia caused by aspirating food.

7

68.  A family member tried to be present at feeding time to assure that Mrs. Adams received adequate and warm food and adequate liquids in a safe manner.

69.  Although, the family constantly reminded the caregivers to make certain that Mrs. Adams had enough liquids, she was always very thirsty when a family member came to see her; one day, she gulped downed two bottles of Ensure that Patrick Adams gave her.

70.  Adequate staffing of caregivers for the residents in the reminiscence care area was always an issue at Sunrise at Orchard and did not improve, despite the assurances from Defendants.

71.  Upon information and belief, Defendants caused staffing levels at the facility to be set so that the personnel on duty at any given time could not reasonably meet the needs of the residents in reminiscent care.

72.  Upon information and belief, Defendants operated and managed Sunrise at Orchard so as to maximize profits, by among other things, reducing staffing levels below that which was needed to provide appropriate care to residents.

73.  Sunrise at Orchard devised a service plan for Mrs. Adams and then failed to follow it.

74.  Applicable regulations required the Defendants through their employees to conduct an initial and periodic comprehensive, accurate, standardized assessment, formulate a care plan tailor-made for each resident, including reasonable objectives and timetables to meet the medical, nursing, mental and psychosocial needs of the resident, including Mrs. Adams and then implement and follow that care plan.

75.  The Defendants, through their employees and/or agents, were required, under applicable regulations, as well as general standards of care, to develop and implement a reasonable and appropriate care plan for Mrs. Adams as well as operate in a manner so as to prevent the types of injuries suffered by Mrs. Adams.

76.  On the morning of June 12, 2019, Sunrise at Orchard was short staffed once again.

77.  Although, Mrs. Adams was a two-person assist, only one caregiver named Maeza came to Mrs. Adams's room to change and dress her.

78.  Upon information and belief, Maeza left Mrs. Adams on the edge of the bed in a sitting position to get a towel out of the bathroom.

79.  Mrs. Adams fell over onto the floor and gashed her head open.

8

80. Sunrise at Orchard assessed Mrs. Adams and determined that she had a head gash only but called Sharon Adams and South Metro Fire Department Paramedics to assist.

81. When Sharon Adams arrived, South Metro Fire Department had just finished examining Mrs. Adams's head and all present recommended to Sharon Adams not to take her to the hospital emergency room as the gash was not serious.

82. Unknown to Sharon Adams, Mrs. Adams also fractured her femur in the fall from the bed to the floor.

83. Sharon Adams followed the recommendations of the professionals and declined to have Mrs. Adams taken to the emergency room and instead permitted her to go to the dining area for breakfast.

84. The family had requested a physical therapist come to observe how the staff was handling Mrs. Adams and determine the appropriate wheelchair for her.

85. Jay Rollins ("Mr. Rollins"), the physical therapist from Bayada arrived at noon on June 12, 2019 to observe Mrs. Adams.

86. Mr. Rollins asked two caregivers (one of whom was Meaza) to show him how they transferred Mrs. Adams from her wheelchair to her bed.

87. The caregivers complied with his request but did not put the breaks on the wheelchair; did not remove the arm of the wheelchair for easy transfer; and tried to "clumsily" pick Mrs. Adams up from the front of her wheelchair.

88. Mr. Rollins had to stop the caregivers from proceeding to move Mrs. Adams from her wheelchair to her bed.

89. Mr. Rollins told Sharon Adams and a nurse with Sunrise at Orchard that Mrs. Adams was not safe with these caregivers.

90. In his Report, Mr. Rollins wrote: "the caregivers demonstrate unsafe set-up and initiation of transfer...[f]urther caregiver training indicated to improve safety in home environment."

91. Mr. Rollins noted in his report that Mrs. Adams appeared to be in pain.

92. On June 12, 2019, Nurse Robyn King, came to see Mrs. Adams. She noted in her report that Mrs. Adams was at a high fall risk; was suffering from poor nutrition and poor medical compliance; and had inadequate support of the caregivers.

93. After the fall, Sharon Adams had been told that Sunrise at Orchard had ordered a strong formula of Tylenol for Mrs. Adams.

94. The family kept asking all day if Sunrise at Orchard had the Tylenol and was repeatedly told it was on its way.

95. Late in the day on June 12, 2019, Sharon Adams obtained permission from the nurse at Sunrise at Orchard to get over-the-counter Tylenol for Mrs. Adams.

96. Later in the night of June 12, 2019, Christelle Beck found Mrs. Adams in bed on her side, shaking, moaning, breathing irregularly, and in apparent distress.

97. Christelle Beck went upstairs to find the nurse on duty and demanded that she check on Mrs. Adams and take her vital signs.

98. The nurse complied and after checking on Mrs. Adams recommended that Mrs. Adams be taken to the hospital.

99. South Metro Fire Department Paramedics transported Mrs. Adams to Sky Ridge Hospital where it was discovered that Mrs. Adams had a newly broken femur, was dehydrated, and was suffering from atrial fibrillation due to the stress.

100. When Mrs. Adams was transported to the hospital, both Sharon Adams and Christelle Beck saw there were multiple new bruises on Mrs. Adams, including bruises on her abdomen, under her right arm, on both breasts, on both feet, and a scrape on her back and a large bedsore.

101. None of the injuries listed in paragraph 100 above were ever reported to the family and all of the injuries occurred sometime between June 2, 2019 through June 12, 2019.

102. All of the injuries were in areas that were covered with clothing; the family had no knowledge of the injuries because they only saw her dressed.

103. The records of South Metro Fire Department show that Mrs. Adams sustained two falls at Sunrise at Orchard although the family had only been notified of one fall.

104. Prior to June 12, 2019, Mrs. Adams had never had an occurrence of atrial fibrillation.

10

105.    Mrs. Adams was kept in the Intensive Care Unit for a few days to determine whether the atrial fibrillation would subside so that she could have surgery on her femur.

106.    It was determined that Mrs. Adams should not undergo the surgery because the atrial fibrillation did not subside soon enough for a successful surgery on her femur.

107.    Mrs. Adams was moved to the general ward in the hospital and was in a lot of pain.

108.    On June 18, 2019, she was admitted to Hospice care.

109.    Hospice transferred her to Brookdale Greenwood Village where Mrs. Adams passed away on June 20, 2019 moaning in pain with her daughter, Christelle Beck at her side.

110.    After Mrs. Adams left Sunrise at Orchard, Patrick Adams requested a copy of Mrs. Adams file from Defendants, including all medical records, notes from meetings with members of Mrs. Adams family, admission paperwork.

111.    Defendants gave some but not all of her file to Patrick Adams.

### III.    FIRST CLAIM FOR RELIEF
### (Negligence)

112.    Plaintiffs hereby incorporate paragraphs 1 to 111 as though fully set forth herein.

113.    At all times relevant hereto, Defendants owed a duty to Mrs. Adams, Patrick Adams, and Christelle Beck, to exercise reasonable care in the monitoring, treatment and supervision of Mrs. Adams while she was a resident of Sunrise at Orchard.

114.    Upon accepting Mrs. Adams as a resident at Sunrise at Orchard, Defendants individually and jointly assumed direct, non-delegable duties to Mrs. Adams to provide her with adequate and appropriate healthcare, as well as custodial services.

115.    If Defendants were unable or unwilling to meet the needs of Mrs. Adams, they had an affirmative duty and legal obligation to discharge Mrs. Adams from Sunrise at Orchard.

116.    Defendants, by and through their employees, breached their duty of care and failed to use reasonable care by, among other things:

    a.    Negligently allowing Mrs. Adams to fall multiple times while a resident of Sunrise;

    b.    Negligently permitting Mrs. Adams to be covered with bruises and injuries by unknown caregivers or residents;

11

c.  Negligently permitting Mrs. Adams to suffer numerous injuries;

d.  Negligently failing to report multiple incidents of injuries to the State of Colorado and the family;

e.  Negligently permitting Mrs. Adams to fall off the bed despite that she was at high risk of falling with several risk factors, including, but not limited to, her age, dementia, previous brain injury, and anti-psychotic medication;

f.  Negligently under reporting the fall of June 12, 2019 to South Metro Fire Department and to Sharon Adams;

g.  Negligently failing to cause Mrs. Adams to be sent to the Emergency Room for a full evaluation immediately after her fall;

h.  Negligently understaffing its caregivers and having only one caregiver with Mrs. Adams the morning of June 12, 2019;

i.  Negligently failing to supervise staff as necessary to prevent injury to Mrs. Adams;

j.  Negligently allowing Mrs. Adams to suffer a severe injury while a resident at Sunrise;

k.  Negligently failing to have present at Sunrise an adequate number of properly trained employees to provide care for Mrs. Adams while she was a resident at Sunrise;

l.  Negligently failing to train their employees in how to provide care for Mrs. Adams while she was a resident at Sunrise;

m.  Negligently failing to provide a safe environment for someone like Mrs. Adams suffering from end stage dementia;

n.  Negligently failing to follow the recommendations of Ms. Taylor, the speech therapist;

o.  Negligently failing to train their employees on how to transfer a resident in and out of a wheelchair;

p.  Negligently failing to follow the specific care plan for Mrs. Adams.

117.  As a direct and proximate result of Defendants' acts and/or omissions and their breach of their duty of care, negligence, carelessness and recklessness, Mrs. Adams suffered 1) severe permanent physical injuries resulting in severe pain and suffering; 2) mental

12

anguish, embarrassment, humiliation, degradation, emotional distress, and loss of personal dignity; 3) loss of capacity for enjoyment of life; 4) otherwise unnecessary medical expenses and hospital expenses; 5) severe pain and suffering; and 6) death.

118.  In causing the above stated injuries, Defendants knew or should have known that Mrs. Adams would suffer such harm.

119.  The Defendants' multiple breaches of the duties owed to Plaintiffs as forth above caused Plaintiffs to suffer economic loss, non-economic loss, personal injury and death. Damages include pain and suffering, severe emotional distress, grief, upset, loss of companionship, impairment of quality of life, inconvenience, hospital bills, medical expenses, funeral expenses, and other damages allowable by Colorado law in an amount to be determined by the jury at trial.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## IV.  SECOND CLAIM FOR RELIEF
### (Negligence Per Se)

120.  Plaintiffs hereby incorporate paragraphs 1-119 as though fully set forth herein.

121.  At all times relevant hereto, there existed in the State of Colorado laws, rules and regulations governing Defendant's care of Sunrise at Orchard residents, including Mrs. Adams.

122.  Defendants failed to comply with the State of Colorado laws, rules and regulations pertaining to the operation of Sunrise at Orchard, including those pertaining to the care of Sunrise at Orchard residents, including Mrs. Adams. As such, Defendants committed negligence per se.

123.  As a direct and proximate result of Defendants' acts or omissions constituting negligence per se resulting in the death of Mrs. Adams, Plaintiffs have been caused to suffer damages and injuries, including but not limited to, medical and other healthcare expenses incurred in treating Mrs. Adams following her injuries at Sunrise at Orchard, funeral expenses, grief, sorrow, loss of companionship, impairment of quality of life, inconvenience, pain and suffering, psychological and emotional stress relating to wrongful death of Mrs. Adams and other damages allowable by Colorado law.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## V.    THIRD CLAIM FOR RELIEF
### (Vicarious Liability of Defendants for the Acts and Omissions of Defendants' Employees and/or Agents for Negligence and Negligence Per Se)

124.    Plaintiffs hereby incorporate paragraphs 1-123 as though fully set forth herein.

125.    At all times relevant hereto, Ms. Oehrlein, Ms. Russell, Maeza, and other staff working at Sunrise at Orchard were employees and/or agents of one or more of the Defendants and were acting within the course and scope of their employment and/or agency.

126.    Defendants are vicariously liable for the negligent acts and/or omissions of their employees and/or agents within the course and scope of their employment and/or agency.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## VI.    FOURTH CLAIM FOR RELIEF
### (Negligent Training and Supervision)

127.    Plaintiffs hereby incorporate paragraphs 1-126 as though fully set forth herein.

128.    Defendants had a duty to their residents, including Mrs. Adams, and to Plaintiffs, to exercise reasonable care in the training and supervision of their employees and/or agents at Sunrise at Orchard.

129.    As a direct and proximate result of Defendants' negligent training and supervision of their employees and/or agents, Mrs. Adams suffered injury, pain, severe emotional distress, and discomfort while residing at Sunrise and physical injury that resulted in her death.

130.    As a direct and proximate result of Defendants' negligent training and/or supervision of its employees and/or agents at Sunrise at Orchard, Plaintiffs have been caused to suffer damages and injuries, including but not limited to, medical and other healthcare expenses incurred in treating Mrs. Adams following her injuries at Sunrise at Orchard, funeral expenses, grief, sorrow, loss of companionship, impairment of quality of life, inconvenience, pain and suffering, psychological and emotional stress relating to wrongful death of Mrs. Adams and other damages allowable by Colorado law.

WHEREFORE, Plaintiffs pray for relief as set forth below.

14

## VII.    FIFTH CLAIM FOR RELIEF
### (Negligent Hiring and Staffing)

131.    Plaintiffs hereby incorporate paragraphs 1-130 as though fully set forth herein.

132.    At all times relevant hereto, Defendants owed a duty to the residents of Sunrise at Orchard, including Mrs. Adams, and to Plaintiffs, to use reasonable care in hiring its staff, employees and/or agents at Sunrise at Orchard.

133.    At all times relevant hereto, Defendants owed a duty to the residents of Sunrise at Orchard, including Mrs. Adams, and to Plaintiffs, to use reasonable care in employing a sufficient number of employees, staff and/or agents at Sunrise at Orchard such that there was an adequate staff-to-resident ratio.

134.    At all times relevant hereto, Defendants owed a duty to the residents of Sunrise at Orchard, including Mrs. Adams, and to Plaintiffs, to use reasonable care in following all State of Colorado laws, rules and regulations pertaining to staffing of a facility such as Sunrise at Orchard.

135.    At all times relevant hereto, Defendants failed to use reasonable care and were negligent in their hiring and staffing of Sunrise at Orchard, including but not limited to:

    a.    Failing to provide adequate number of staff to safely attend to the needs of the residents of Sunrise at Orchard;

    b.    Failing to use reasonable care in the screening and qualification of its employees and/or agents to ensure that Sunrise at Orchard employees and/or agents were properly qualified and capable of providing safe and adequate supervision of the residents of Sunrise at Orchard, such as Mrs. Adams;

    c.    Failing to use reasonable care in hiring employees and/or agents that were properly qualified and capable of providing safe and adequate supervision of the residents of Sunrise at Orchard, such as Mrs. Adams.

136.    Mrs. Adams suffered injuries as a direct result and proximate result of neglect, abuse and/or inadequate supervision of the employees and staff at Sunrise at Orchard.

137.    Mrs. Adams suffered injuries resulting in wrongful death as a direct result and proximate result of neglect, abuse and/or inadequate supervision of the employees and staff at Sunrise at Orchard.

138. Defendants' negligent hiring was a direct and proximate cause of Mrs. Adams injuries and a direct and proximate cause of her death.

139. Defendants' negligent staffing was a direct and proximate cause of Mrs. Adams injuries and a direct and proximate cause of her death.

140. As a direct and proximate result of Defendants' negligent hiring of employees and/or agents and staffing at Sunrise at Orchard, Plaintiffs have been caused to suffer damages and injuries, including but not limited to, medical and other healthcare expenses incurred in treating Mrs. Adams following her injuries at Sunrise at Orchard, funeral expenses, grief, sorrow, loss of companionship, impairment of quality of life, inconvenience, pain and suffering, psychological and emotional stress relating to wrongful death of Mrs. Adams and other damages allowable by Colorado law.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## VIII.   SIXTH CLAIM FOR RELIEF
### (Damages for Wrongful Death Pursuant to C.R.S. §13-21-210, et seq)

141. Plaintiffs hereby incorporate paragraphs 1-140 as though fully set forth herein.

142. The Plaintiffs, Christelle Beck and Patrick Adams are the children of Mrs. Adams, deceased, and bring this wrongful death action on behalf of all the surviving heirs of Mrs. Adams.

143. The Defendants caused severe injuries to Mrs. Adams leading to her ultimate death.

144. As a result of the injuries to Mrs. Adams, medical expenses, hospital expenses and funeral expenses were incurred and are claimed together with all damages permitted under the Colorado Wrongful Death Act.

145. The injuries Mrs. Adams sustained at the hands of the Defendants, and as a result of Defendant's purposeful understaffing of the Facility, ultimately led to Mrs. Adams's death.

146. As a result of Defendants' negligence and wrongful acts or omissions, Mrs. Adams suffered fatal injuries as more fully set forth herein, and the Plantiffs claim all medical and burial expenses and all damages permitted under the Colorado Wrongful Death Act.

WHEREFORE, Plaintiffs pray for relief as set forth below.

16

## IX.   SEVENTH CLAIM FOR RELIEF
### (Violation of the Colorado Consumer Protection Act)

147.   Plaintiffs hereby incorporate paragraphs 1-146 as though fully set forth herein.

148.   At all times relevant to this Complaint, the Defendants had in effect an extensive marketing campaign designed to attract actual and potential consumers of their services to contract with Sunrise of Orchard.  As part of their campaign they offer within their Residency Agreement a list of designated rights that the patient will receive in their care.

149.   As a part of the Residency Agreement titled *Resident Rights*, Mrs. Adams had the following rights:

   a.   The right to be treated with respect and dignity.

   b.   The right to privacy.

   c.   The right not to be sexually, verbally, physically or psychologically abused, humiliated, intimidated, or punished.

   d.   The right to be free from neglect.

   e.   The right to expect the cooperation of the provider in achieving the maximum degree of benefit from those services which are made available by the facility.

   f.   The right to receive services in accordance with the resident agreement and the care plan.

150.   Mrs. Adams was the designated beneficiary of these rights.

151.   The Defendants knew that its facility was incapable of providing the level of care and treatment necessary to fulfill the promises and representations contained in the *Resident Rights*.

152.   The Defendants' promises and representations about the quality of care and the level of services provided at Sunrise at Orchard were unfair and deceptive.

153.   The Defendant's deceptive and fraudulent representations about the level and quality of care offered at Sunrise at Orchard constitute deceptive trade practices actionable under the Colorado Consumer Protection Act, C.R.S. § 6-1-101, *et seq*.

154. These deceptive and fraudulent practices also constitute a pattern of deceptive trade practices.

155. As a result of the Defendants' deceptive trade practices and violations of the Colorado Consumer Protection Act, Plaintiffs have suffered actual damages in an amount to be determined by the jury at trial.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## X.  EIGHTH CLAIM FOR RELIEF
### (Breach of Contract)

156. Plaintiffs hereby incorporate paragraphs 1-155 as though fully set forth herein.

157. As a part of the Residency Agreement titled *Resident Rights*, Mrs. Adams had the following rights:
   a. The right to be treated with respect and dignity.

   b. The right to privacy.

   c. The right not to be sexually, verbally, physically or psychologically abused, humiliated, intimidated, or punished.

   d. The right to be free from neglect.

   e. The right to expect the cooperation of the provider in achieving the maximum degree of benefit from those services which are made available by the facility.

   f. The right to receive services in accordance with the resident agreement and the care plan.

158. Mrs. Adams was the designated beneficiary of these rights.

159. Defendants breach this provision of the contract in not assuring that these rights were provided to Mrs. Adams and failed to provide any of the above listed rights to Mrs. Adams.

160. As a direct and proximate result and consequence of Defendants' breach of the Residency Agreement, Mrs. Adams sustained damages, losses and injuries in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against the Defendants in an amount to be determined by the jury at trial, and for the following relief and damages:

    a.   Economic loss;

    b.   Non-economic loss;

    c.   Attorney's fees;

    d.   All damages permitted by the Colorado Wrongful Death Act;

    e.   Court costs and witness fees;

    f.   Pre-judgment and post-judgment interest on any award of damages to the extent permitted by law;

    g.   Treble damages and actual damages under the Colorado Consumer Protection Act; and

    h.   For such other and further relief as this Court may deem just and proper.

**Plaintiffs hereby demand a trial by jury as to all claims so triable.**

**This matter is exempt from C.R.C.P. 16.1 as the damages claimed herein exceed $100,000.**

Respectfully submitted this 24th day of March 2020.

Leslie A. Frost, #40386
**Frost & Beck, PC**
*Attorney for Plaintiffs*